

**In the**
**Court of Appeals**
**Second Appellate District of Texas**
**at Fort Worth**

_____

No. 02-24-00240-CR

_____

NATHAN LEE WANNER, Appellant

V.

THE STATE OF TEXAS

---

On Appeal from the 367th District Court
Denton County, Texas
Trial Court No. F19-3848-16

---

Before Sudderth, C.J.; Wallach and Walker, JJ.
Memorandum Opinion by Chief Justice Sudderth

## MEMORANDUM OPINION

Appellant Nathan Lee Wanner appeals his conviction for continuous sexual abuse of a young child; namely, A.L. (Amy).[1]  *See* Tex. Penal Code Ann. § 21.02(b). He seeks reversal on four grounds, claiming that the trial court erred by (1) failing to ask certain statutorily required jury qualification questions on the record; (2) admitting hearsay testimony from three purported outcry witnesses; (3) admitting a prior victim's testimony over Wanner's Article 39.14 objection; and (4) failing to specify the location of Wanner's continuous sexual abuse in the jury charge's application paragraph.  Because several of these complaints were not preserved and those that were preserved were not erroneous or harmful, we will affirm.

## I.  Background

Wanner dated Amy's mother (Mother) from 2010 to 2014, while Amy was approximately six to ten years old.  During that time, Wanner lived with Mother and her children—including Amy[2]—and the family moved between several different houses in Lewisville and The Colony.  Wanner sexually abused Amy at those houses.

---

[1]We use aliases to refer to child victims and their family members.  *See* Tex. R. App. P. 9.10(a)(3); 2d Tex. App. (Fort Worth) Loc. R. 7.

[2]Amy's older brother lived with the family during a portion of the relevant time period.  And, later, Mother and Wanner had a child together.

## A.    Abuse

Amy described the abuse at trial a decade later.  She recalled how it began at the family's house in Lewisville with Wanner "go[ing] under [her] shirt and tickl[ing] her]" and "unbuttoning [her] pants to [purportedly make her] feel comfortable" when she took naps.  Then, when they moved to a house in The Colony, Amy awoke in the middle of the night to find Wanner taking off her pajamas and touching her vagina. After the first touching incident, the touching was "fairly constant in every house [they] lived in" after that.

In fact, it progressed when the family moved to another house in The Colony because Mother "started going out of town for work, so then [Amy] was left with [Wanner]."  She estimated that Wanner had touched her "at least like a hundred times between . . . living in those houses" but that it had occurred too many times to count.[3]

In 2014, when Amy was ten or eleven years old, she told Mother of the abuse,[4] and Mother kicked Wanner out of the home.[5]  But at the time, Amy claimed that the

---

[3]Amy recounted how Wanner would "make [her] take . . . nap[s] with him in [Wanner and Mother's] bedroom" and would touch her during the naps, and she described how Wanner would "insist on helping [her]" bathe then "have [her] close [her] eyes" and "spread [her] legs open" when she was in the bathtub.

[4]Mother described the outcry at trial, testifying that she and Amy were driving in a rental car when Amy told her, "momma, he's touched me down there," causing Mother to wreck the car.

[5]Mother admitted that, although she had kicked Wanner out of the house after Amy's outcry, she remained romantically involved with him for a period of time.

abuse had occurred just once, and although Amy spoke with the police about it, the case was not prosecuted.

Several years passed, and Mother married another man (Stepfather). Then, in 2019, Amy saw a video at her Catholic church regarding the signs of groomers of sexual abuse.[6] When Stepfather picked Amy up from the church event, he asked about it, and she told him about the video and the fact that Wanner had abused her not just once but on multiple occasions. This disclosure led to a more detailed conversation between Amy and Mother as well as a new police investigation and forensic interview. Wanner was soon indicted for continuous sexual abuse of a young child. *See* Tex. Penal Code Ann. § 21.02.

## B.    Trial

Wanner pleaded not guilty and claimed that Amy had fabricated the allegations and changed her story over time. The case proceeded to a jury trial, which involved five events of particular significance to this appeal:    (1) the jury's qualification, (2) Amy's testimony, (3) the outcry witnesses' testimony, (4) a prior victim's testimony, and (5) the jury's charge.

---

[6]Stepfather explained that the video was part of the church's "[s]afe training," which was "something that [wa]s put on by the Catholic faith because there have been many, many priests, unfortunately, that are taking advantage of young boys and girls." He explained that the classes taught participants that, "if [they] see these things, if [they] witness these things, anything from sitting in their laps to tickling them, . . . just what to do in these situations[ and] who to contact."

### 1. Jury's Qualification

There is no record of the preliminary jury qualification procedures—specifically, the trial court's confirmation that each juror met the statutory requirements of Article 35.12 of the Code of Criminal Procedure. However, neither party objected to the lack of a record and neither party claimed that any of the jurors were unqualified to serve. And after voir dire, Wanner confirmed that he had no objection to the selected jurors being seated.

### 2. Amy's Testimony

At trial, Amy described Wanner's abuse. One of the many things she recounted for the jury was how, in 2019, she had "watch[ed] a video about the signs of groomers and sexual abuse" at a church event, how her "stepdad [had] asked [her] about what the class was about," and how she had "ended up sharing to him [her] similar experiences." She recalled what she had shared—"[h]ow [Wanner] would tickle [her] . . . high up on [her] thighs" and the "details of how he would come into [her] room at nighttime."

Amy also told the jury a way in which she had attempted to escape Wanner's abuse. She explained that, at one of the family's houses in The Colony, there had been "a slight break" in the frequency of Wanner's abuse "because [she] had a bunk bed, and [she] would sleep on the top so [Wanner] wouldn't get up there."

In addition to Amy's testimony, the State offered testimony from several individuals whom Amy had told of the abuse.

5

### 3.  Outcry Witnesses' Testimony

Before trial began, the State identified three anticipated outcry witnesses to whom Amy had first disclosed her abuse:  Mother, Stepfather, and Amy's forensic interviewer.  The trial court held a hearing on the admissibility of the three witnesses' testimony.

After previewing the anticipated testimony, Wanner argued that Mother was the only appropriate outcry witness because Stepfather "ha[d] no specific details" of any offense and because every instance of abuse that the State anticipated exploring with the forensic interviewer had been disclosed to the interviewer "in [less] detail tha[n Amy's] mother [could] testif[y] to."[7]  But the trial court ruled that, because Amy's disclosures had come in waves and each of the three witnesses had been the first to hear about a certain aspect of Wanner's abuse, each witness could testify to his or her wave of disclosure—Mother to Amy's 2014 disclosure, Stepfather to Amy's 2019 "conversation in the vehicle on the way home" from church, and the forensic interviewer "regarding [Amy's] attempting to sleep in a bunk bed" to deter Wanner from abusing her.

---

[7]Wanner asserted that the State was "trying to bootstrap the forensic interviewer to testify" as an outcry witness because Mother was "not going to be the best witness for them."

However, as trial proceeded, things changed. Mother testified to far more than the 2014 disclosure,[8] and Wanner did not object. Stepfather, meanwhile, said very little regarding Amy's 2019 disclosure to him. He did not relay Amy's statements in the car but testified only that, when he had picked Amy up from the church event, "she [had] kind of divulged, I guess, more or less what had actually happened" and had "ma[d]e an outcry with regards to sexual abuse."

The forensic interviewer, in turn, provided a broader range of testimony than that initially authorized by the trial court, but she did so under a different theory of admissibility: as evidence of Amy's prior consistent out-of-court statements.[9] *See* Tex. R. Evid. 801(e)(1)(B). Regardless, the portion of the forensic interviewer's testimony that related to Amy's bunk bed—the outcry testimony initially authorized by the trial court—mirrored the testimony offered by Amy.

### 4.  Prior Victim's Testimony

In addition to Amy, Mother, Stepfather, and the forensic interviewer, the State also offered testimony from a prior victim: K.H. (Katie).

---

[8]Mother gave a detailed account of Amy's revelations not only in 2014 but also in 2019, and she described the abuse's continuing effects on Amy.

[9]About halfway through the trial—well after the hearing on outcry witnesses—the State asked the trial court to allow the forensic interviewer to testify regarding the full contents of Amy's interview to rebut Wanner's theory that Amy had fabricated or changed her story based on ulterior motives. The trial court ruled in the State's favor, authorizing the testimony.

Katie alleged that, one night in 2001, when she was fourteen years old, Wanner was staying at her family's house, and he came into her bedroom and grabbed her breasts while she was in bed.[10] Wanner argued that Katie's testimony should be excluded because the police report associated with her case had referenced photographs of the crime scene—i.e., Katie's home—and the State had not provided Wanner with copies of the photographs. But the State explained that neither the prosecutors nor the relevant police department had the photographs. Katie's case had not been indicted and was more than twenty years old by the time of trial, so when the prosecutors contacted the police department that had investigated Katie's case, "all they were able to provide . . . was the police report." Wanner asked Katie (outside the jury's presence) if she "remember[ed] being at the house . . . when some police officers came and took some photographs," but she stated that she did not recall that occurring. The prosecutors thus represented that they "d[id not] know whether or not these pictures [even] exist[ed]."

Nonetheless, after Wanner raised his objection to Katie's testimony, the prosecutors reached back out to the relevant police department and asked it "to go ahead and do another search" for the photographs. The prosecutors noted as much on the record, telling the trial court that the police department's follow-up "search [had] turn[ed] up that there [wa]s no media attached to [Wanner's case]" and "no

---

[10]Some of the details that Katie described, such as Wanner crawling when he exited the room, were similar to those that Amy had described.

media attached to their police reports." In short, "[t]he photographs that [we]re referenced in the police report, [the police department] d[id] not have [them] to provide to anyone." The trial court thus overruled Wanner's objection to Katie's testimony.

### 5. Jury's Charge

After all of the evidence had been presented, the trial court charged the jury. The charge recited the allegations in Wanner's indictment—"the offense of Continuous Sexual Abuse of a Young Child, alleged to have been committed . . . in Denton County, Texas"—and it asked the jury to determine whether Wanner had committed the crime "as charged in the indictment." However, the application paragraph of the charge did not repeat the indictment's reference to Denton County as the location of Wanner's acts, and the trial court did not instruct the jury regarding any venue or other location-related limitations.

## C. Verdict

The jury found Wanner "guilty of the offense of Continuous Sexual Abuse of a Young [Child], as alleged in the indictment." *See* Tex. Penal Code Ann. § 21.02(b). And after hearing additional evidence, the jury assessed Wanner's punishment at 50 years' confinement and a $10,000 fine. *See id.* § 21.02(h).

## II. Discussion

Wanner alleges that the trial court harmfully erred in four ways: (1) by failing to ask certain statutory jury qualification questions on the record; (2) by admitting

hearsay testimony from the three alleged outcry witnesses; (3) by admitting Katie's testimony; and (4) by failing to specify the location of Wanner's offense in the jury charge's application paragraph.[11]

## A.    Jury's Qualification:  No Error or Harm

Wanner first argues that the trial court erred by failing to ask the jury all of the Article 35.12 qualification questions on the record.

Article 35.12 of the Code of Criminal Procedure requires a trial court to test "the qualifications of those present who have been summoned to serve as jurors" by asking several questions, including whether the individuals are under indictment or legal accusation for a theft or felony.  Tex. Code Crim. Proc. Ann. arts. 35.10, 35.12(a); *see Hadley v. State*, Nos. 02-23-00317-CR, 02-23-00318-CR, 2024 WL 5083195, at *1 (Tex. App.—Fort Worth Dec. 12, 2024, pet. ref'd) (mem. op., not designated for publication); *Njogo v. State*, No. 02-18-00245-CR, 2018 WL 6844140, at *1 (Tex. App.—Fort Worth Dec. 31, 2018, no pet.) (mem. op., not designated for publication).  But "there is no requirement under Article 35.12 that the prospective jurors be qualified on the record."  *Bonilla-Rubio v. State*, No. 02-23-00200-CR, 2024 WL 4377437, at *2 (Tex. App.—Fort Worth Oct. 3, 2024, no pet.) (mem. op., not designated for publication).  So when, as here, there is no record of the trial court asking the Article 35.12 questions, then unless something in the record affirmatively

---

[11]Wanner's appellate issues are reordered for organizational purposes.

shows otherwise, the appellate court must presume that the trial court asked the qualification questions and that the jury was properly impaneled and sworn.[12] Tex. R. App. P. 44.2(c)(2); *Hadley*, 2024 WL 5083195, at *1. The record of Wanner's case does not affirmatively show otherwise. *See Bonilla-Rubio*, 2024 WL 4377437, at *2 (rejecting challenge to trial court's failure to qualify jury on the record and noting that "a silent record is not enough to amount to an 'affirmative' showing" that the statutory qualification procedure did not occur). To the contrary, the record shows that neither party objected to the jury's qualifications, to the lack of a recording of the qualification procedures, or to the jury's being seated.

Wanner acknowledges the silent record and corresponding presumption of regularity, but he asserts that the jury's qualifications cannot be presumed. According to him, because a jury trial is a constitutional right, a jury's qualifications are of constitutional significance, so the trial court's failure to record its compliance with the statutory qualification procedures amounts to constitutional error, and the appellate court cannot presume compliance. But we have repeatedly rejected similar attempts to characterize Article 35.12 compliance as a constitutional issue. *See Hadley*, 2024 WL 5083195, at *2 ("As we did in *Njogo*, we specifically reject Hadley's argument that a

---

[12]"As we have noted in . . . prior case[s] arising out of Denton County, '[i]n larger judicial districts, it is standard to ask the qualifying questions of the general jury pool, typically in a central jury room, under the direction of the court before the venire members are sent to their respective courts to be impaneled for a specific case.'" *Hadley*, 2024 WL 5083195, at *2.

11

trial court's alleged failure to assess the veniremembers' qualifications under Article 35.12 amounts to constitutional and structural error."); *see Njogo*, 2018 WL 6844140, at *1–2 (rejecting argument that "the trial court's alleged failure [to assess the jurors' qualifications under Article 35.12 on the record] amounts to constitutional and structural error" (footnote omitted)).

And for much the same reason, even if we were to ignore the presumption of regularity in this context, because the error is not constitutional, the trial court's alleged failure to conduct the Article 35.12 qualification procedure would support reversal only if Wanner could "make[] a showing of significant harm by the service of [a] disqualified juror."[13] *Njogo*, 2018 WL 6844140, at *2 (noting multiple sister courts of appeals that have held similarly and stating that "we have not found any contrary authority suggesting that the trial court's failure to test veniremembers' qualifications is immune from a harm analysis"); *see Hadley*, 2024 WL 5083195, at *2; *Nigussie v. State*, No. 05-23-00442-CR, 2024 WL 4595026, at *4 (Tex. App.—Dallas Oct. 28, 2024, pet. ref'd) (mem. op., not designated for publication); *Bonilla-Rubio*, 2024 WL 4377437, at *3 n.2; *see also Gray v. State*, 159 S.W.3d 95, 98 (Tex. Crim. App. 2005) (clarifying that, "when only a statutory violation is claimed, the error must be treated as non-

---

[13]Wanner asserts that "other intermediate-appellate courts have imposed [this] standard" for harm, but he overlooks the fact that this court has done so as well. *See Hadley*, 2024 WL 5083195, at *2; *Bonilla-Rubio*, 2024 WL 4377437, at *3 n.2; *Njogo*, 2018 WL 6844140, at *1–3. Indeed, this court has done so in cases involving Wanner's own appellate counsel. *See Hadley*, 2024 WL 5083195, at *1; *Bonilla-Rubio*, 2024 WL 4377437, at *3 n.2.

constitutional for the purpose of conducting a harm analysis"). Wanner admits that he cannot identify any member of the jury who was disqualified under Article 35.12. He thus cannot show harm. *See Hadley*, 2024 WL 5083195, at *2 ("Because the record does not show that a disqualified juror served in this case, and because Hadley neither identifies a disqualified juror nor argues that any of the selected jurors were disqualified, he has not shown harm.").

We overrule his first issue.

## B.  Outcry Witnesses' Testimony:  No Preservation or Harm

Wanner next complains that the trial court abused its discretion by admitting testimony from the three anticipated outcry witnesses—Mother, Stepfather, and the forensic interviewer.[14]

Generally, in a trial for continuous sexual abuse of a young child, the trial court may admit hearsay testimony relaying the child victim's first outcry of the abuse to an adult. *See* Tex. Code Crim. Proc. Ann. art. 38.072; *State v. Sanchez*, No. 02-24-00254-CR, 2025 WL 1006287, at *5–6 (Tex. App.—Fort Worth Apr. 3, 2025, pet. ref'd).  If a defendant objects to the admission of the proffered outcry testimony, and if his objection at trial comports with the complaint he raises on appeal, then we review the trial court's admission of the outcry testimony for an abuse of discretion. *See Hance v.*

---

[14]Although Wanner claims that Amy did not expressly identify her Mother as the first adult she told of the abuse, his own trial counsel elicited testimony on the subject.  Wanner's counsel asked Amy whether, "from 2007 to 2019, [she] told [her] mom once in 2014, and that's it," and Amy confirmed that, "[y]es," that was correct.

13

*State*, 714 S.W.3d 775, 809–10 (Tex. App.—Fort Worth 2025, no pet.) (op. on reh'g); *Lumsden v. State*, 564 S.W.3d 858, 880 (Tex. App.—Fort Worth 2018, pet. ref'd); *see also Templin v. State*, No. 02-17-00229-CR, 2019 WL 311145, at *3 (Tex. App.—Fort Worth Jan. 24, 2019, no pet.) (mem. op., not designated for publication).

Wanner claims that the trial court abused its discretion by admitting any of the State's proffered outcry testimony. He asserts that because Amy did not testify at the outcry hearing to expressly identify the first adult she told of Wanner's abuse, it was possible that she told an adult long before she told any of the State's witnesses. Therefore, Wanner reasons, "the trial court did not hear evidence of who the *first* person over eighteen was that heard the various outcries," and it abused its discretion by admitting any outcry testimony at all.

But Wanner did not raise this objection at trial. He did not object to Mother's testimony as an outcry witness, instead insisting that "the correct outcry witness ha[d] to be the mother." And an objection is a fundamental requirement to preserve a complaint for appeal. Tex. R. App. P. 33.1(a) (describing a timely and specific trial court objection as "a prerequisite to presenting a complaint for appellate review"); *see Templin*, 2019 WL 311145, at *3 (rejecting appellant's complaint that "the trial court failed to comply with [A]rticle 38.072's procedural requirements for admission" because "he never alerted the trial court that he believed those requirements had not been met").

14

As for Stepfather and the forensic interviewer, although Wanner objected to their anticipated outcry testimony, he did so by arguing that Stepfather "ha[d] no specific details . . . of any original offense" and that Amy had not told her forensic interviewer anything more than she had told Mother. Wanner said nothing about the State's failure to rule out the theoretical possibility that Amy might have told another unidentified adult at some point in the past. In other words, "the complaint on appeal [does not] comport[] with the complaint made at trial." *Pena v. State*, 285 S.W.3d 459, 464 (Tex. Crim. App. 2009); *see Hance*, 714 S.W.3d at 810 (holding portion of evidentiary complaint not preserved because, although appellant had objected to some of the challenged evidence under Rule 403, he had not objected on the relevance grounds raised on appeal, and "error preservation . . . requires . . . an objection comporting with the opponent's complaint on appeal"); *Garcia v. State*, No. 02-17-00081-CR, 2018 WL 1095692, at *2–3 (Tex. App.—Fort Worth Mar. 1, 2018, no pet.) (mem. op., not designated for publication) (rejecting challenge to outcry testimony when appellant objected to State's failure to give timely notice of outcry witnesses but argued on appeal that outcry testimony was insufficiently specific as to how, when, or where the abuse occurred).

Moreover, even if we were to ignore the incongruity between Wanner's appellate complaint and his trial objections to Stepfather's and the forensic interviewer's testimony, Wanner concedes that "[t]he witnesses and [Amy] testified largely to the same facts." Indeed, Amy described her 2019 disclosure to Stepfather in

15

far greater detail than Stepfather did, and she described her use of a bunk bed to deter Wanner's abuse before the forensic interviewer took the stand. "Texas courts, including this court, have repeatedly held that testimony about . . . a child's statements concerning a sexual crime are harmless when other, unobjected-to evidence proves the same facts." *Lumsden*, 564 S.W.3d at 891; *see Stephens v. State*, Nos. 02-15-00046-CR, 02-15-00047-CR, 2016 WL 2586639, at *4–5 (Tex. App.—Fort Worth May 5, 2016, pet. ref'd) (mem. op., not designated for publication) (holding that admission of forensic interview recording was harmless when victim and school counselor testified to same facts); *Matz v. State*, 21 S.W.3d 911, 912–13 (Tex. App.—Fort Worth 2000, pet. ref'd) (op. on remand) (holding that admission of video statement of sexual assault victim was harmless when victim testified because "[i]t is well-established that the improper admission of evidence does not constitute reversible error if the same facts are proved by other properly admitted evidence");[15] *see also Cook v. State*, 665 S.W.3d 595, 600 (Tex. Crim. App. 2023) ("The erroneous admission of evidence will not result in reversal when other such evidence was received without objection, either before or after the complained-of ruling." (internal quotation marks omitted)).

For all of these reasons,[16] we overrule Wanner's second issue.

---

[15]Wanner recognizes that "other courts" have applied this rule, but he overlooks the fact that this court has done so as well. *See Lumsden*, 564 S.W.3d at 891; *Stephens*, 2016 WL 2586639, at *4–5; *Matz*, 21 S.W.3d at 912.

[16]Wanner's complaint regarding the forensic interviewer's hearsay testimony has another fatal flaw as well: the admission of her testimony did not turn on the

16

## C.    Prior Victim's Testimony:  No Error

Wanner next contends that the trial court should have excluded Katie's testimony as a discovery sanction under Article 39.14 of the Code of Criminal Procedure.  *See generally* Tex. Code Crim. Proc. Ann. art. 39.14.

When reviewing a trial court's ruling on discovery or the admission of testimony, we apply an abuse of discretion standard.  *State v. Heath*, 696 S.W.3d 677, 688 (Tex. Crim. App. 2024); *Hance*, 714 S.W.3d at 809; *Branum v. State*, 535 S.W.3d 217, 224 (Tex. App.—Fort Worth 2017, no pet.).  "As long as a trial court's evidentiary ruling is within the zone of reasonable disagreement, this [c]ourt will not intercede."  *Heath*, 696 S.W.3d at 689; *see Hance*, 714 S.W.3d at 809.

Wanner asserts that the trial court abused its discretion because the record showed that the State had failed to produce the crime-scene photographs alluded to in the police report on Katie's case.  He claims that this failure violated Article 39.14 of the Code of Criminal Procedure and that the missing photographs impeded his ability to cross-examine Katie.  But even assuming that Wanner had preserved this

---

outcry exception to the hearsay rule.  Although the trial court initially authorized a limited amount of the forensic interviewer's testimony under the outcry exception, the court subsequently admitted a broader range of hearsay testimony under a different theory of admissibility:  to prove Amy's prior consistent statement.  *See* Tex. R. Evid. 801(e)(1)(B).  The outcry exception's applicability was thus moot.  *See Reed v. State*, 497 S.W.3d 633, 638 (Tex. App.—Fort Worth 2016, no pet.) (holding that, because testimony from outcry witnesses was supported by other hearsay carveouts or exceptions, the trial court did not abuse its discretion by admitting such testimony).

challenge,[17] the trial court's ruling was within the zone of reasonable disagreement because the record—and the seemingly uncontested facts—showed that no Article 39.14 violation had occurred.

Article 39.14 requires the State to disclose exculpatory, impeachment, or mitigating evidence "in [its] possession, custody, or control," and upon timely request, to produce any photographs "in [its] possession, custody, or control." Tex. Code Crim. Proc. Ann. art. 39.14(a), (h). But here, none of the parties were clear on whether the twenty-year-old crime-scene photographs even existed at the time of this case, and to the extent that they did, the State represented that the photographs were not in its "possession, custody, or control." *Id.*; *see Chandler v. State*, No. 02-18-00166-CR, 2018 WL 6565812, at *1 n.2 (Tex. App.—Fort Worth Dec. 13, 2018, pet. ref'd) (mem. op., not designated for publication) (noting that "the State's duty to turn over

---

[17]At trial, Wanner argued that it was the State's responsibility to seek out and provide all evidence relevant to Katie's credibility, but he did not mention Article 39.14. Rather, the only legal authority that Wanner specifically identified was *Brady*; he argued that, "[i]t [wa]s not [his] job to ask for photos from a report that the[ State] asked for and saw that photos were there" and that "it[ wa]s the[ State's] duty on a *Brady* to do that." *See generally Brady v. Maryland*, 373 U.S. 83, 83 S. Ct. 1194 (1963). Article 39.14 and *Brady* are not the same thing, and raising an objection based on one does not preserve an appellate challenge based on the other. *See Sopko v. State*, 637 S.W.3d 252, 255–56 (Tex. App.—Fort Worth 2021, no pet.) (noting appellant's "conflat[ing] the standards governing Article 39.14 violations and due process violations under *Brady*"); *Ahn v. State*, No. 02-17-00004-CR, 2017 WL 6047670, at *6 (Tex. App.—Fort Worth Dec. 7, 2017, no pet.) (mem. op., not designated for publication) (holding appellant failed to preserve request for mistrial under *Brady* when he objected under Article 39.14).

material evidence and exculpatory evidence [under Article 39.14] does not extend to lost items but instead is limited to items in its possession, custody, or control.").

Katie testified that she had no memory of the police photographing the crime scene, i.e., her home, and both the prosecutors and the relevant police department represented that they did not have the photographs. The police department even conducted a second search for the photographs when the issue arose at trial, and the department confirmed that its system had no photographs or other media associated with Katie's case. *Cf. Heath*, 696 S.W.3d at 708 (clarifying that, "[u]nder Article 39.14, 'the state' means the State of Texas, not an individual prosecutor," and "the obligation to produce material evidence extends to evidence that is in the possession of law enforcement agencies"). Wanner did not question the truthfulness of any of these representations.[18] So although no one knew whether the photographs had been lost, destroyed, or never created to begin with, the overwhelming—and, again, seemingly uncontested—evidence showed that they were not in the State's possession, custody, or control for purposes of this case. The trial court did not abuse its discretion by implicitly finding as much and denying Wanner's Article 39.14 objection to Katie's testimony on that basis. *Cf. State v. Villarreal*, 692 S.W.3d 844, 852–53 (Tex. App.—Corpus Christi–Edinburg 2024, pet. ref'd) (holding trial court erred by dismissing

---

[18]Nor did Wanner preserve the appellate record by offering the sole piece of evidence that he relied upon to show the photographs' existence: the police report associated with Katie's case.

indictment under Article 39.14 because relevant videos had been lost or deleted and it was thus undisputed that they were not in the State's possession); *Coleman v. State*, 577 S.W.3d 623, 634–35 (Tex. App.—Fort Worth 2019, no pet.) (holding State did not violate Article 39.14 by not seeking out or disclosing the identity of an informant when it did not know the identity and thus "had nothing to disclose").

We overrule this issue.

## D.    Jury's Charge:  No Harm

In his final complaint, Wanner asserts that the jury charge's application paragraph was erroneous because it did not notify the jury that, to convict him, it needed to find not just that he had committed predicate acts of sexual abuse but also that those acts had occurred in Texas.  *See Lee v. State*, 537 S.W.3d 924, 926 (Tex. Crim. App. 2017) (clarifying that, for sufficiency purposes, "[e]ach predicate offense must be a violation of Texas law" so out-of-state sexual abuse did not qualify as a predicate act).  According to Wanner, the trial court had a duty to sua sponte inform the jury of this geographic limitation as part of the law applicable to the case.

But even if we assume that the trial court should have included the offense's location in the jury charge's application paragraph,[19] its failure to do so did not egregiously harm Wanner.

---

[19]Location is not an element of the offense of continuous sexual abuse of a child.  *Keith v. State*, No. 02-24-00034-CR, 2024 WL 4899022, at *2 (Tex. App.—Fort Worth Nov. 27, 2024, no pet.) (mem. op., not designated for publication); *Hinojosa v. State*, 555 S.W.3d 262, 267 (Tex. App.—Houston [1st Dist.] 2018, pet. ref'd) (similar);

20

An unobjected-to charge error, such as the alleged error here, will warrant reversal only if it egregiously harms the defendant by depriving him of a fair and impartial jury. *Reed v. State*, 680 S.W.3d 620, 625–26 (Tex. Crim. App. 2023); *Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim. App. 1984) (op. on reh'g). Theoretical harm is insufficient; the charge error must have had an actual, practical effect on the jury's deliberations. *Reed*, 680 S.W.3d at 626. We assay the existence and degree of actual harm based on the state of the evidence, the arguments of counsel, the entire jury charge, and other relevant record information. *Id.*; *Vasquez v. State*, 389 S.W.3d 361, 370 (Tex. Crim. App. 2012).

The state of the evidence in this case confirms that all of Wanner's abuse occurred in Texas. *See Almanza*, 686 S.W.2d at 171 (noting that "harm must be assayed in light of . . . the state of the evidence"). Even Wanner acknowledges this.

---

*see* Tex. Penal Code Ann. § 21.02(b). And although the offense's location is important for purposes of territorial jurisdiction, proper venue, and evidentiary sufficiency, Wanner does not challenge any of those. *See Lee*, 537 S.W.3d at 926 (clarifying that "Texas ha[d] jurisdiction over the [continuous sexual abuse] case as long as one element of the offense occurred in Texas" but that, for sufficiency purposes, "[e]ach predicate offense must be a violation of Texas law" so out-of-state abuse does not qualify); *Schmutz v. State*, 440 S.W.3d 29, 34–35 (Tex. Crim. App. 2014) (recognizing that "venue is not an 'element of the offense' under Texas law" and clarifying that proper venue may be presumed unless it is disputed in the trial court or the record affirmatively demonstrates otherwise); *cf. Cox v. State*, 497 S.W.3d 42, 53–56 (Tex. App.—Fort Worth 2016, pet. ref'd) (holding that because territorial jurisdiction did not involve disputed fact issue and legislature had not recognized it as an affirmative defense, the trial court did not err by failing to instruct the jury regarding territorial jurisdiction). Nor has Wanner cited any legal authority holding that the application paragraph's failure to repeat the offense's Texas location is error in this context.

21

Amy testified that Wanner abused her at their house, and although they moved between several houses during the relevant time period, all of the houses were in Lewisville or The Colony—i.e., in Texas. *See EspinalCruz v. State*, Nos. 05-22-00626-CR, 05-22-00627-CR, 2023 WL 8615813, at *5 (Tex. App.—Dallas Dec. 13, 2023, no pet.) (mem. op., not designated for publication) (holding continuous sexual abuse charge was not erroneous for failing to include instruction limiting predicate acts to those in Texas because victim "never testified to acts of abuse that took place anywhere but Texas"). There was no evidence of Wanner abusing Amy outside of Texas.[20] Indeed, there was no evidence of Wanner abusing Amy outside of Denton County.

And because the Texas location of Wanner's abuse was a non-issue, the topic did not come up in the parties' jury arguments at all.[21] *See Almanza*, 686 S.W.2d at 171 (noting that "the actual degree of harm must be assayed in light of . . . the contested issues . . . [and] the argument of counsel").

Plus, the jury charge as a whole conveyed the Texas location of Wanner's alleged abuse. *See id.* (noting that "harm must be assayed in light of the entire jury charge"). Although the charge's application paragraph did not specify a location for

---

[20]Even Wanner's abuse of Katie—though not a predicate act—was alleged to have occurred in Texas.

[21]The parties' jury arguments addressed the abuse's location at different houses, but it was undisputed that all of the relevant houses were in Texas.

the offense, the application paragraph authorized the jury to convict if it found that Wanner had committed the offense "as charged in the indictment." *See Hollins v. State*, No. 01-22-00776-CR, 2024 WL 4982504, at *9–10 (Tex. App.—Houston [1st Dist.] Dec. 5, 2024, no pet.) (mem. op., not designated for publication) (holding that application paragraph's failure to name owner of stolen property was not erroneous when paragraph included "as charged in the indictment" language); *Rolle v. State*, 367 S.W.3d 746, 757–59 (Tex. App.—Houston [14th Dist.] 2012, pet. ref'd) (holding that application paragraph on transferred intent was not erroneous for failing to recite burglary element of capital murder when paragraph and jury form both included "as charged in the indictment" language). And, elsewhere in the charge, it explained that the indictment "alleged [Wanner's crime] to have been committed . . . in Denton County, Texas." *See Vasquez*, 389 S.W.3d at 371 (concluding that jury charge indicated lack of egregious harm when application paragraph did not apply the law of parties but referred to defendant acting "as a party (as herein defined)" and thus referenced abstract portion); *cf. EspinalCruz*, 2023 WL 8615813, at *5 (rejecting complaint regarding continuous sexual abuse charge's failure to separately instruct jury that predicate acts must have occurred in Texas when charge and application paragraph stated that offense occurred "in Dallas County, Texas"). Against this backdrop, the verdict form signed by the presiding juror reaffirmed that "the jury[] f[ound] the defendant . . . guilty of the offense of Continuous Sexual Abuse of a Young [Child], as alleged in the indictment."

23

Based on the state of the evidence and the charge's repeated references to the indictment—which specified the Texas location of Wanner's abuse—it is difficult to imagine how the application paragraph's repetition of the location could have had any practical effect on the jury's deliberations or verdict. Nothing in the record indicates that such repetition would have made a difference. *See Almanza*, 686 S.W.2d at 171 (noting that "harm must be assayed in light of . . . any other relevant information revealed by the record of the trial as a whole"). So, even assuming that the instruction should have been given, the error did not cause Wanner egregious harm.

We overrule Wanner's final issue.

### III. Conclusion

Having overruled Wanner's four appellate issues, we affirm the trial court's judgment of conviction. Tex. R. App. P. 43.2(a).

/s/ Bonnie Sudderth

Bonnie Sudderth
Chief Justice

Do Not Publish
Tex. R. App. P. 47.2(b)

Delivered: September 25, 2025